RETIREMENT BENEFIT PLAN OF GRAPHIC ARTS INTERNATIONAL UNION LOCAL 20–B With Certain Employers, an employee benefit plan, and Donald MacDonnel, Trustee, Plaintiffs,

v.

STANDARD BINDERY COMPANY, a Michigan corporation, Donald F. Schultz, Theodore L. Schultz, S.T. Schultz, Mary A. Schultz and Sara E. Schultz, Defendants.

Civ. No. 84–CV–0034–DT.

United States District Court,
E.D. Michigan, S.D.

Sept. 23, 1986.

Jay W. Tower, Nancy L. Kahn, Southfield, Mich., for plaintiffs.

Wayne G. Wegner, Grosse Pointe Farms, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This suit is a claim for withdrawal liability, filed by the plaintiff Retirement Plan pursuant to Title IV of the Employee Retirement Income Security Act, 29 U.S.C.

§ 1301 *et seq.,* or "ERISA." The Plan raises claims under ERISA not only against the defendant Michigan Corporation, which ceased operations and contributions to the plan on June 30, 1982, but also against the individual defendants herein, all of whom are shareholders, former shareholders, or relatives of shareholders in the family-held corporation. Plaintiff also raises claims under the Michigan law of fraudulent conveyances, on theories of equitable lien or subordination, and MCLA 450.1551. The matter was tried by the court and this memorandum constitutes its findings of fact and conclusions of law.

Plaintiff is the Retirement Benefit Plan of Graphic Arts International Union Local 20–B, maintained pursuant to collective bargaining agreements between the Local Union and numerous employers within its jurisdiction whose contributions are required. From July of 1963 through June of 1982, defendant Bindery was a party to the local's contracts, agreed to make certain contributions for each of its employees within the local's bargaining unit, and did so. Defendant S.T. Schultz is the founder of the Bindery, husband of Sara Schultz, and father of defendants Donald and Theodore Schultz. Mary Schultz is the wife of defendant Donald Schultz.

The elder Schultz couple, S.T. and Sara, sold their stock in the corporation to their sons in 1970. Since then, the history of the business has been one of constant withdrawal of capital and waning income. With the purchase of their parents' shares, the sons each became owners of approximately fifty percent of the company. The parents were paid for those shares from the corporate coffers, however, and the father continued as a director and paid consultant for many years thereafter. The sons drew salaries, expenses, and made withdrawals of equity for personal expenses (such as for payment of personal income taxes) which, every year after 1975, exceeded the net income of the company. Retained earnings turned negative in 1976, and by the fiscal year ending June 1980 the equity of the company had been completely exhausted.

As capital withdrawals increased and the Bindery's assets dwindled, City National Bank decreased its line of credit, and the individual defendants began to provide the company with needed funds for operations with "loans". Significantly, as capital disappeared, the Bank required personal guarantees that the "loans" be subordinated to it, eventually required that the corporate notes held by the individuals be endorsed, assigned and surrendered to it, and required that no others be issued in their place. Nevertheless, in February 1982 after being notified by the Union of withdrawal liability, defendants did issue themselves new notes, eliminating the names of the wives who had originally participated in the loans, and providing that they were "secured" lenders. Of the approximately thirteen notes which the corporation issued to the defendants for its operating funds, only six had maturity dates, and none of those dates were honored. There was no sinking fund for retirement of the loans. The testimony was consistent, indeed, that defendants only expected to be repaid if the company's assets were to be liquidated, or if some windfall befell it. The mother and father both testified that they had intended to lend the funds for as long as their sons needed them in the business. That was, in fact, the intention of every defendant lender herein. Defendants were convinced that they could not obtain additional credit anywhere else.

The business closed in June 1982, and between that July and the following January, 1983, the Bindery distributed $110,250 to defendant S.T. Schultz, $80,050 to defendant Donald F. Schultz, and $20,950 to defendant Theodore L. Schultz, in purported repayment of their loans. Those distributions were made after full payment had been made on the secured debt to City National Bank, taxes due, the landlord, and to most unsecured creditors. After repayment of their loans to the corporation, defendants had no investment at risk whatsoever in the then-insolvent business.

On January 31, 1983, the Plan sent the Bindery a notice and demand for payment

of withdrawal liability in accordance with ERISA, 29 U.S.C. §§ 1382, 1399(b)(1)(A) and (B). The notice was received by all defendants. The assessment was for the sum of $257,550.80. Defendants failed to request a review of the assessment of that notice within 90 days, or to make any payments as scheduled. On October 12, 1983, the Plan served a notice that failure to make the scheduled payments within 60 days would result in a declaration of default, in accordance with § 4219(c)(5) of ERISA (29 U.S.C. § 1399(c)(5)). As no payment was made, a statutory default was then declared.

## CORPORATE LIABILITY

■ Defendant Standard Bindery made no request for arbitration, as provided under 29 U.S.C. § 1401(a)(1).

Under the provisions of 29 U.S.C. §§ 1381–1405, an employer withdrawing from a multiemployer pension plan while having unfunded vested benefits incurs a withdrawal liability to the plan. The amount is to be determined by the Plan Trustees and demanded of the employer, as was done here. Where the employer makes no request for review within 90 days of the demand, or request for arbitration within 120 days from the request for review, the amount of liability demanded is deemed due and owing and is collectible by suit in the district courts of the United States for both legal and equitable relief. 29 U.S.C. § 1451.

In this case, as there was no request for review or for arbitration, this court must award plaintiffs, from the Standard Bindery Corporation, the assessed amount of $257,550.80, as well as double interest and reasonable attorneys fees and costs, under 29 U.S.C. §§ 1132, 1451. Defendants now challenge the amount of liability, however, claiming it is statutorily diminished because the corporation was insolvent. The court cannot credit that argument: first, because the challenge to the amount was not timely made, and second because, as is explained below, the firm was not insolvent. The court finds that the "loans" to Standard Bindery from its shareholders

and their family were not in true fact loans, but were capital contributions. Accordingly, judgment enters as requested against the corporation.

## LIABILITY OF INDIVIDUAL DEFENDANTS

■ ERISA provides, at 29 U.S.C. § 1392(c), that in a proceeding to collect withdrawal liability:

If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

That section reflects the congressional intent "that effective enforcement of (the withdrawal liability) rules will require Plan sponsors, employers, and courts to disregard sham transactions, or transactions structured to avoid or evade liability...." Senate Committee Report (P.L. 96–364); Senate Labor and Finance Commission's Joint Explanation of S–1076 (July 24, 1980) 4. CCH Pension Plan Guide ¶ 15,679.10.

It appears to the court that the transactions herein which characterized the individual defendants' 1976–1982 capital advances to the Bindery as loans, which purported to secure those advances, and the later distributions made by the Bindery to individual defendants in purported repayment of loans after June 30, 1982, are all transactions which must be disregarded, in compliance with § 1392(c).

The advances made by the individual defendants herein were clearly capital contributions and not loans, under the "totality of the circumstances" test uniformly applied by the courts to such challenged transactions in the tax and bankruptcy contexts. See *John Kelley Co. v. Commissioner of Internal Revenue*, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1945); *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In Re Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980); *A.R. Lantz Co. v. U.S.*, 424 F.2d 1330, 1333 (9th Cir.1970); *Tanzi v. Fiberglass Swimming Pools, Inc.*, 414 A.2d 484 (R.I.1980). The circumstances which the courts have consistently found most telling in the totality,

and which are notably present in this case, include:

1. The absence of a fixed maturity date on most of the loan notes, and the failure to honor those dates which were fixed, or to repay any of the loans until the company's liquidation.

2. The stated understanding of the lenders that the corporation could repay their loans whenever it became able; or could keep their funds as needed.

3. The absence of any reasonable expectation that the corporation could repay the loans in the ordinary course of its business, as noted in the testimony of accountant McAuliffe.

4. The poor debt equity ratio of the corporation when the loans were commenced; the continued equity withdrawals; and the absence of any equity by 1977, although these loans continued to provide operating funds.

5. The fact that the lender-shareholder-officer-brothers were in total control of the corporation and had the power to denominate all transactions in issue as they saw fit.

6. The total identity of interest of the non-shareholder lenders with the two shareholder brothers. Their parents and wife clearly acted only in their interest and at their behest, and not as arms-length lenders or creditors.

7. The fact that the brothers withdrew capital simultaneously with the infusion of new funds by loans; and the facts that retained earnings were negative by 1976, no capital remained after 1980, and that from 1977 to 1982 all corporate capital consisted of the subject "loans" all compel the conclusion that the appellation of the transactions must be disregarded.

8. The admitted inability of the corporation to obtain operating funds elsewhere suggests that the loans were in actuality, capital contributions. The Bank had required, in fact, that these loans be treated as capital, in relation to funds loaned it, and that these lenders be subordinated

*and* that these notes be endorsed and delivered as collateral.

9. The absence of any sinking fund or any other provision by the corporation to even repay this indebtedness. It is noteworthy, also, that none of these so-called creditors ever requested any protection or security until late 1981, when the union wrote the Bindery advising of the concept of withdrawal liability. Thereafter, defendants set about to attempt to secure the loans which they had already subordinated and assigned to the Bank as collateral for the corporate debt.

Finally, defendants themselves recognized that their contributions were in actuality capital when, at dissolution of the corporation, they paid all other creditors, except the pension plan, before repaying themselves.

All of the above factors, in various combinations, have been recognized by this Circuit in making the determination as to whether a transfer of funds is capital or a loan. *See Livernois Trust v. Commissioner of I.R.S.,* 433 F.2d 879 (6th Cir.1970); *Austin Village, Inc. v. U.S.,* 432 F.2d 741 (6th Cir.1970); *Foresun, Inc. v. Commissioner of IRS,* 348 F.2d 1006 (6th Cir.1965); *Moughon v. Commissioner of IRS,* 329 F.2d 399 (6th Cir.1964).

The court in *Multiponics, supra,* also pointed out that the assertion of good faith by the alleged shareholder-lenders is not a defense to a claim such as this by the actual creditors of the under-capitalized corporation.

In short, the characterizations of the capital infusions as loans and the repayment of the purported loans to the shareholders and family herein were transactions to evade or avoid liability pursuant to 29 U.S.C. § 1392(c) and must be disregarded. The transaction purporting to secure the notes also, to the extent it was effective at all after the notes had been endorsed and delivered to the Bank, is similarly to be disregarded. Indeed, this transaction, if it has significance at all, is significant evidence of defendants' lack of the good faith which they claim here. The attempt to

secure their status behind all other creditors but superior to the Pension Plan, immediately after learning of withdrawal liability, and after a special meeting in consultation with their attorney, is a clear attempt to evade or avoid liability to the Plan.

FRAUDULENT CONVEYANCE

■ Michigan law provides, at MCL § 566.14, that:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made and the obligation is incurred without a fair consideration.

If a conveyance is made to satisfy an alleged antecedent debt which is not shown to have existed, then fair consideration is lacking, under the statute, and the conveyance may be set aside. MCLA § 566.19; *Plymouth United Savings Bank v. Lee,* 278 Mich. 545, 270 N.W. 781 (1936). Inasmuch as the contributions made by these shareholders and their family to the Bindery were in actuality capital contributions and not loans, their repayment ahead of bona fide creditors constituted fraudulent conveyances under Michigan law, and must be set aside.

EQUITABLE SUBORDINATION

■ Despite the known existence of the Bindery's debt of withdrawal liability to the Pension Plan, the directors of the corporation participated in the "[d]istribution of assets to shareholders during or after dissolution of the corporation without paying, or adequately providing for all known debts, obligations, and liabilities of the corporation." MCLA § 450.1551. Those directors, the brothers Donald and Theodore Schultz, are therefore liable in Michigan law jointly and severally to the unpaid Pension Plan creditor for the dissipated assets. *Id. See also Muskegon v. Amec, Inc.,* 62 Mich.App. 644, 233 N.W.2d 688 (1975).

CONCLUSION

For all of the reasons outlined above, judgment will enter against each of the defendants herein in the amount of $257,550.80, with interest, penalties, attorneys fees, and costs.

IT IS SO ORDERED.