TRANSCO EXPLORATION COMPANY,
Plaintiff–Appellee,

v.

PACIFIC EMPLOYERS INSURANCE
COMPANY, Defendant–Appellant.

No. 88–3656.

United States Court of Appeals,
Fifth Circuit.

April 11, 1989.
Rehearing Denied May 24, 1989.

Peter L. Hilbert, Jr., Kathleen K. Charvet, McGlinchey, Stafford & Mintz, New Orleans, La., for defendant-appellant.

Donald R. Abaunza, Don K. Haycraft, Liskow & Lewis, New Orleans, La., for plaintiff-appellee.

Before GEE, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case, we are asked to declare the winner in a game of grammatical tug-of-war between an excess insurer and an insured over whether an excess insurance policy "drops down" in place of a policy issued by a now-insolvent primary insurer. On summary judgment, the district court ruled in favor of the insured. Because we conclude, however, that the language of the policy cannot support this result, we reverse and render judgment in favor of the excess insurer.

I.

The relevant facts in this case are undisputed and few in number. An injured worker employed by Salen Protexa Drilling Company ("Salen"), which has now been dissolved, sued Transco Exploration Company ("Transco") under whose policy Transco was an additional assured. As a result of the Jones Act suit, Transco sought indemnity from Salen and its insurers, for whom Salen acted as a drilling contractor. As is all too common, Salen's primary insurer, Midland Insurance Compa-

ny, which insured Salen for liabilities up to $500,000, is currently insolvent. Transco therefore sought indemnity from Salen's provider of excess liability coverage, Pacific Employers Insurance Company ("Pacific"). Subject to an agreement that they would litigate the issue of whether the excess coverage provided by Pacific "drops down" to provide primary coverage because of Midland's insolvency, Transco and Pacific entered into an agreement whereby they would each fund $250,000 of a $500,-000 settlement with the injured worker.

After consummation of the settlement, Transco filed the instant action, in which it seeks a declaratory judgment to the effect that the policy written by Pacific as excess insurer drops down to provide primary coverage as a result of Midland's insolvency. On cross-motions for summary judgment, the district court held that, under the terms of the policy, Pacific's coverage did drop down in place of the Midland policy and entered judgment in favor of Transco for $250,000.[1]

## II.

### A.

■ Our first task is to determine which law governs our interpretation of the policy language. Because the Pacific excess insurance policy specifically insures against certain maritime risks, injuries, and losses, we deem it to be maritime insurance within the meaning of *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Under *Wilburn Boat,*

the interpretation of a contract of marine insurance is—in the absence of a specific and controlling federal rule—to be determined by reference to appropriate state law.

*Ingersoll–Rand Fin. Corp. v. Employers Ins. of Wausau,* 771 F.2d 910, 912 (5th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 573 (1986). Our choice of the "appropriate state law" is

apparently to be determined by use of an interest analysis. See *id.*

■ We hold that, in this case, Texas has the greatest interest in the litigation. Although Pacific is incorporated and has its principal place of business in California, the insurance contract was delivered to the corporate headquarters of Salen, a Texas general partnership, in Houston, Texas. Transco, a general partner of Salen, has its principal place of business in Texas. The accident giving rise to the lawsuit and settlement took place on the outer continental shelf offshore Lousiana, not in Louisiana territorial waters; Louisiana's only connection with the suit is that the settlement of the injured worker's Jones Act claim took place in Louisiana.

In light of these facts, we agree with the district court's conclusion that Texas's legitimate and substantial interest in regulating contracts that are delivered to, and insure the activities of, Texas businesses outweighs the interests of either California or Louisiana in the case at bar. We thus look to Texas insurance law for the principles that govern the interpretation of Pacific's excess insurance policy.

### B.

■ At issue is the interpretation of the following language in the excess insurance policy that seeks to define the limits of Pacific's liability:

With respect to personal injury, property damage or advertising injury, or any combination thereof, [Pacific's] liability shall only be for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:

(a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof [the $500,000 Midland policy], plus the applicable limits of any other underlying insurance collectible by the Insured; or

(b) ....

In essence, the question before us is the grammatical reach of the phrase "collect-

---

**1.** As "interpretation of a contract is a question of law, including the question whether the contract is ambiguous" our review of the district court's decision is *ve nobo. Ross v. Western Fidelity Ins.*

*Co.,* 872 F.2d 665, 668 (5th Cir.1989), *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).

ible by the Insured." Both parties agree that, to be included in the calculation of Salen's retained limit, "any other [i.e., non-scheduled] underlying insurance" must be collectible; the battle is joined, however, over whether scheduled underlying insurance—in this case, the Midland policy—must also be collectible before it is included in the calculation.[2]

No Texas court has passed upon this question; nor has our court, using either Texas, federal, or any other state's law. Other courts that have addressed this question have split, with the majority interpreting the quoted policy language to provide that of the two types of underlying insurance defined in the policy—scheduled and nonscheduled—only the latter need be collectible.[3] All of these courts reached their conclusions using general principles of insurance contract construction, upon which Texas law is similarly based.[4]

We conclude that the quoted language admits of only one reasonable interpretation: It plainly contemplates two types of underlying insurance, scheduled and non-scheduled. Each appears in a distinct phrase, as is evidenced by the use of a comma between the words "hereof" and "plus" and by the use of the word "plus" itself. The most natural reading of the language is therefore to read the two phrases separately, with the collectibility requirement being confined to the second phrase. With the policy so construed, only nonscheduled underlying insurance need be collectible to be included in the calculation of the insured's retained limit; the limits of scheduled underlying insurance—in this case, the Midland policy—is included regardless of whether the insured can actually collect on the policy.

Transco argues that this interpretation reads the word "other" out of the language. The use of the word "other," it contends, necessarily implies that the things being compared belong to the same group; in order to give the word its proper meaning, both scheduled and nonscheduled underlying insurance must be collectible, lest they belong to different groups.[5]

**2.** All agree that, under this court's holding in *Mission Nat'l Ins. Co. v. Duke Transp. Co.,* 792 F.2d 550 (5th Cir.1986), the Midland policy is not "collectible," as Midland is currently insolvent.

**3.** Five courts have held that only nonscheduled insurance must be collectible. *See McGlynn v. Salen Protexa Drilling Co.,* No. 85–146, slip op. at 8–9 (E.D.La. June 30, 1988) [1988 WL70108] (interpreting the same policy under California law); *see also Zurich Ins. Co. v. Heil Co.,* 815 F.2d 1122, 1124–26 (7th Cir.1987) (applying Wisconsin law); *Radiator Specialty Co. v. First State Ins. Co.,* 651 F.Supp. 439, 441–43 (W.D.N.C.) (not specifying which state's law it applied), *aff'd,* 836 F.2d 193 (4th Cir.1987); *United States Fire Ins. Co. v. Capitol Ford Truck Sales, Inc.,* 257 Ga. 77, 355 S.E.2d 428, 432–33 (1987) (Georgia law); *Value City, Inc. v. Integrity Ins. Co.,* 30 Ohio App.3d 274, 508 N.E.2d 184, 187–89 (1986) (Ohio law). Only two courts, other than the district court in this case, have reached a contrary conclusion. *See Poirrer v. Cajun Insulation, Inc.,* 501 So.2d 800, 806–08 (La.App. 4th Cir.1986), *cert. denied,* 502 So.2d 579 (La.1987); *Geerdes v. St. Paul Fire & Marine Ins. Co.,* 128 Mich.App. 730, 341 N.W.2d 195, 197 (1983).

**4.** In short order, they are: (1) give the contractual language its plain meaning; (2) where possible, construe the words so as to harmonize all while rendering none superfluous; and (3) if the language is ambiguous in that it admits of two reasonable interpretations, construe it against the drafting party. *See Kelly Assocs., Ltd. v. Aetna Casualty & Sur. Co.,* 681 S.W.2d

593, 596 (Tex.1984); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 115 (Tex. 1978).

**5.** In support of its argument, Transco refers us to the example used by the *Geerdes* court:

> Compare, for example, the following sentence: 'I have read *Murder on the Orient Express* and other mystery novels by Agatha Christie.' By virtue of the word 'other' in the final clause, the sentence clearly conveys the notion that *Murder on the Orient Express* is a mystery novel by Agatha Christie. To construe the sentence as suggesting that the cited writing lacks any of those qualities would be to ignore the ordinary meaning of the word 'other.'

341 N.W.2d at 197 n. 1. We are not persuaded by the court's example, although it is interesting. The central problem with the example is that the answer to the question which the court addresses—whether the language implies that Agatha Christie is the author of *Murder on the Orient Express*—is already obvious before the court even begins its grammatical analysis. The obviousness of the answer therefore colors the court's reasoning. In contrast, when confronted with an example in which one is unsure whether Agatha Christie authored the *specified* novel, one is correspondingly unsure whether the word "other" implies only that the specified book is a mystery novel or that it is a mystery novel authored by Agatha Christie. In that situation, one must turn, as we do, to other grammatical clues to deduce a conclusion.

We reject Transco's reasoning. First, although Transco is correct in pointing out that normally the word "other" is to be used only when comparing things belonging to the same group, its argument neglects the more fundamental aspects of the word, namely, its divisive and comparative functions. Within the group of underlying insurance, the policy language indicates that, for its purposes, there are two subgroups, and it does so by using the word "other." There is scheduled underlying insurance and "other"—i.e., nonscheduled—underlying insurance. Use of the word "other" therefore serves to distinguish the two groups, making it possible for each one to be treated in distinct phrases and subject to different requirements.

In contrast, it is Transco's interpretation that would read the word "other" out of the policy language. If both scheduled and nonscheduled underlying insurance were to be subject to the collectibility requirement, there would be no reason to use "other" to split underlying insurance into scheduled and nonscheduled subgroups. Rather, the language could simply read "(a) an amount equal to the limits of liability of any collectible underlying insurance." Such a reading would render superfluous the parties' obvious effort to separate scheduled from nonscheduled underlying insurance; in keeping with the general principles of construction for insurance contracts, we are compelled to reject it.[6]

### III.

In sum, we hold that the policy language quoted above directs that scheduled underlying insurance need not be collectible to be included in the calculation of the insured's retained limit. We therefore REVERSE the judgment of the district court and

RENDER judgment in favor of Pacific in the amount of $250,000.

---

6. Transco's final argument is that, regardless of the conclusion we draw as to the meaning of the policy language, the split in the courts that have interpreted this language indicates that the language is ambiguous, and should therefore be construed against Pacific. As stated above, we believe that the language admits of only one reasonable interpretation; our conclusion is not altered by the fact that two courts have reached a contrary, and in our view, erroneous, conclusion. Each court has the duty to decide the cases before it to the best of its ability; holding that the conflicting decisions of other courts in effect "trump" our interpretation of the policy would constitute an abdication of our judicial function.