CARL E. STEWART, Circuit Judge,
dissenting:
I respectfully dissent from the panel majority’s conclusion that the Master Netting, Setoff, and Security Agreement (“Netting Agreement”) is ambiguous regarding joint liability for the following reasons. I agree with the majority’s statement of the facts and procedural history, so I will not recite them here.
The majority concludes that a contract that is absolutely devoid of any reference to “joint liability” and that painstakingly circumscribes the respective rights and obligations of the parties inter se upon an event of default on an underlying agreement, is ambiguous regarding whether it imposes an affirmative obligation on one party to cover all the debts of another. The majority further concludes that this ambiguity requires remanding this case to the district court, ostensibly for the pur *827 pose of adducing evidence of the parties’ intentions regarding their respective obligations. I disagree with both conclusions.
The thrust of the majority’s opinion is that the Netting Agreement is ambiguous because it is susceptible to two possible interpretations: one which the majority concedes gives effect to the plain meaning of the contractual language, and a second interpretation which, by the majority’s own admission, renders other provisions of the contract surplusage and is at best unsupported by any other contractual term.
As the majority acknowledges, a contract is not ambiguous merely because it is susceptible to two or more interpretations. Moreover, it is axiomatic that a contract is susceptible to two or more interpretations only if more than one of the alternative readings advanced is viable. To “deter-min[e] the presence of ambiguity vel non,” this Court must both examine the provision in question and construe that provision in the context of the agreement as a whole. Central States, Southeast and Southwest Areas Pension Fund v. Creative Dev. Co., 232 F.3d 406, 414 (5th Cir.2000). The particular provision targeted by the majority as the source of ambiguity in the parties’ Netting Agreement appears in section 4, which states in pertinent part:
Upon Non-defaulting Group’s exercise of the Underlying Master Agreements Close-Out, the Settlement Amounts under the Underlying Master Agreements shall be netted and reduced by the exercise of rights to apply Collateral pursuant to all rights granted in this Agreement (as so netted and reduced, the “Final Settlement Amount”). Upon determination of the Final Settlement Amount, Non-defaulting Group shall provide Defaulting Group with a statement showing the calculation of the Final Settlement Amount. The Final Settlement Amount shall be payable by the Group from whom such payment is due on the third Business Day after the statement is provided.
It is undisputed that the functional purpose of this provision is to set forth the rights and duties of the parties following the exercise of the Close-Out remedies afforded by Sections 2(b) and 3 in the event of a default on an underlying master agreement. What is in dispute is the scope of the remedies contemplated by Section 4, specifically, whether that provision imposes joint liability on the parties to the Netting Agreement. Reliant argues that because all of the Enron parties are subject to the Netting Agreement, each individual party is jointly obligated under the contract. Enron Canada counters that the Netting Agreement functions to aggregate a series of underlying master agreements between and among various parties into one agreement for the limited purpose of triangular setting off and netting payments consistent with the underlying agreements. The majority, finding both of the conflicting interpretations staked out by the parties in favor of their respective positions problematic, concluded that section 4 of the Netting Agreement is ambiguous. I disagree, for the following reasons.
In determining whether a contractual provision “could have more than one sensible meaning and thus be ambiguous,” this Court has found it helpful to engage in the “venerable deductive exercise known as the process of elimination.” Creative Dev. Co., 232 F.3d at 414. Applied here, this Court must “first identify all of the possible” procedural and remedial functions of the provision at issue that the “words themselves could conceivably refer to in the context of the entire ... [ajgreement.” Id. “We then examine each such possibility to see if it withstands legal analysis and remains a sensible reading of the agreement. If two or more of the possibilities *828 remain viable, there is ambiguity; but if only one is left standing, there is no ambiguity.” Id.
The parties and the majority have identified two possible interpretations of the impact of section 4’s phrase “Group from whom payment is due ” on the scope of the parties’ rights and obligations: 1) Reliant’s position, that section 4 imposes joint liability on Enron Canada for debts of all of its affiliates; and 2) Enron Canada’s position, that section 4 merely obligates payment from the original group from whom money was due consistent with the applicable underlying master agreement and creates a mechanism for calculating the final settlement amount against that particular party after set-off.
The majority finds Reliant’s assertion that joint liability is evinced by the use of the word “Group” in Section 4 sufficiently compelling to conclude that the parties’ agreement is ambiguous. Under the majority’s proposed construction, the phrase “from whom such payment is due” modifies “Group,” and merely permits a determination of which of the two meanings of “Group” (Enron Group or “Counter Party Group”) “is applicable,” with the result being that “ ‘all Enron Parties’ would become jointly liable to pay the final settlement amount.” I disagree because, as the majority acknowledges, this reading renders the phrase “from whom such payment is due” surplusage once the “Group” is identified in context. “When interpreting a contract, however, this Court is obligated to give meaning to all of its terms-presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.” Transitional Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt., 220 F.3d 427, 481 (5th Cir.2000); Transco Exploration Co. v. Pacific Employers Ins., Co., 869 F.2d 862, 864 n. 2 (5th Cir.1989)(instructing that in contract interpretation we must, “where possible, construe the words so as to harmonize all while rendering none superfluous”). In the instant case, the contract provides that New York law governs, but the analysis is the same. “Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.” Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992)(quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir.1988)). “Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.” Id. (internal quotations and citations omitted). Thus, we cannot leave out terms of a contract or render them surplusage and then declare that there is an ambiguity, itself a result of refusing to give effect to the contract’s express provisions. The effect of the approach taken by the majority is to create a gap where there was none, necessitating resort to putative suppletive rules of joint liability that otherwise appear to be precluded by the contract’s terms, purpose, and commercial context.
Indeed, the majority acknowledges the incongruity of Reliant’s construction with the contract as a whole: “The netting agreement purports to incorporate all of the underlying agreements between the various parties, but the only underlying [master] agreement in the record,” the contract between Reliant and EPMI, “creates no rights to collect amounts owed from anyone but the parties involved in that particular contract.” The majority further concedes that the Netting Agreement’s conferral of the right to offset “amounts owed between two different Enron and Reliant parties does not necessarily mean that a party can collect the Final Settlement amount from all of its counter parties jointly and severally.” From this, *829 the majority concludes the -contract is ambiguous.
However, I find that the interpretation offered by Reliant is neither persuasive nor is it even plausible alternative interpretation. Contrary to the majority’s view, I find that the only viable interpretation, and the one that gives effect to the entirety of the parties’ agreement, is that espoused by Enron Canada, and thus no ambiguity exists. Indeed, the majority concedes that “the plain language of the netting agreement would impose no liability on Enron Canada to pay the final settlement owed to Reliant as a result of EPMI’s default under the Master Power Purchase and Sale Agreement.” As observed by the majority, the definitional language of the Netting Agreement compels this interpretation; by inserting “all Enron Parties” in place of “Group,” the disputed sentence in Section 4 would indicate that the particular party that owes money is obligated to pay, rather than the aggregate of all parties affiliated with the original defaulting party.
Nonetheless, the majority endeavors to go beyond the plain meaning of the agreement’s terms to insert ambiguity where I see none. At the core of the majority’s analysis is its view, shared by Reliant, that giving effect to the “plain meaning” of the contract would “render[] the determination of the Final Settlement Amount meaningless,” and “negate the purpose of the cross-default right ... in section 2(b) and the cross-collateral rights found in section 6 and annex A.” In other words, the majority concludes that Enron Canada’s interpretation of the Netting Agreement renders the other provisions superfluous. In so doing, the majority misapprehends the functions of these provisions. I will address each of these in turn.
First, in concluding that an interpretation of section 4 in accordance with its “plain meaning” renders “the determination of a Final Settlement Amount meaningless,” the majority mistakenly finds that this reading of Section 4 imposes no further duty upon the individual parties other than that in the set-off provision in Section 3 of the Netting Agreement. I disagree because these two sections unambiguously impose different duties on the parties. Section 3 contains the terms and conditions by which the non-defaulting group may setoff amounts owed among the different parties under the various underlying master agreements in order to reach a final settlement amount. Section 4 sets out the terms by which payment will be made once the final settlement amount is reached and also provides for arbitration if there is a dispute over the amount. Although Section 3 expressly grants Reliant the right' to offset “any and all sums, amounts, or Obligations Owed by Defaulting Party to any Non-Defaulting Party” without further notice, Section 4 does not merely echo the same. Whereas Section 3 entitles Reliant to setoff without further notice, Section 4 provides a method for calculating the final settlement amount[1] and a process for notifying the defaulting parties of that amount. The parties’ intent could not be more plain. Indeed, Reliant exercised its rights under Sections 2 and 3 and its rights to determine the final settlement amount and to notify Enron of that amount consistent with Section 4.
Second, the majority mistakenly concludes that Enron Canada’s plain meaning interpretation of Section 4 negates the purpose of the cross-default rights in Section 2. The majority’s reasoning is flawed because it assumes that assigning a cross-default right is tantamount to joint and *830 several liability. In other words, the majority’s view appears to be that because section 2 allows for assigning cross-default (enabling, for example, Reliant to declare Enron Canada in default of EPMI’s debts), then Enron Canada must have an affirmative obligation to pay the other party’s debts. I disagree. Under Section 2(b), upon the occurrence of a default of any of the underlying master agreements, the non-defaulting group may declare the defaulting group in default of all underlying master agreements. Section 2 also provides the non-defaulting party the right to setoff its debts. Thus, by imposing cross-default on the Enron Group as a result of the default of an underlying master agreement, Reliant can exercise its right to set-off. As the Supreme Court has explained, the right of setoff itself is a valuable right. See Citizens Bank of Maryland v. Strumpf 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (“The right of set-off ... allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding ‘the absurdity of making A pay B when B owes A.’ ”) (internal quotation marks and citation omitted).
Neither this right to set-off nor the right to assign cross-default entitle Reliant to the right to collect payment from an Enron party of its choosing. The purpose for allowing cross-default is clear. The Netting Agreement was written to ensure that Reliant and Enron had the right to offset, close out, and liquidate all of the underlying master agreements. In order to facilitate those rights, the Netting Agreement provided for cross-default. There is no indication in the language of the contract that the purpose of allowing cross-default is to impose joint liability or to entitle Reliant to choose from which Enron Party to collect the final settlement amount. Rather, the Netting Agreement’s cross-default simply allows a non-defaulting party to net-out obligations upon the default of a counterparty, and, if insolvency is on the horizon for a defaulting party, the Netting Agreement permits the non-defaulting party to “close-out” (ie. terminate) the transaction to prevent the non-defaulting party’s losses from escalating. See Mark R. Smith, Basic Derivatives for the Oil and Gas Company, 39 Alberta L. Rev. 152, 171-72 (2001). By operation of the netting agreement’s cross-default provision, a non-defaulting party may choose to close-out all transactions under its underlying master agreements “across the board,” even if the triggering event of default involved only one such agreement. Coupled with the net-off, set-off, recoupment, and cross-collateral rights that vest in a non-defaulting party upon the happening of a counterparty’s default, the extension of default status to the affiliates of the offending counterparty significantly mitigates the non-defaulting party’s losses.
Third, the majority mistakenly concludes that to find that Section 4 does not impose joint liability would negate the purpose of the cross-collateral rights contained in Section 6 and the Annex of the Netting Agreement. Like Section 2, however, the cross-collateral rights set forth in the Netting Agreement mitigate the non-defaulting party’s losses upon the default of another by securing the “aggregate” obligations of the defaulting party and its affiliates (“Counter Party Group”). Thus, in the event of a default, the non-defaulting party may apply the collateral from the counterparty of its choosing to satisfy the obligation owed under the applicable underlying master agreement. Interpreting the Netting Agreement to create several obligations is in no way inconsistent with this provision. Rather, the provision expressly limits the remedy available to the non-defaulting party (and thus the exposure of all parties in the defaulting group) to the exhaustion of the amount of collateral pledged.
*831 In essence, the majority finds that a provision that in advance sets forth the amount and source of recovery available to a party upon the default of another is “meaningless” if, when its plain meaning is given effect, the non-defaulting party’s recovery is limited in source and amount such that it bears the risk of a defaulting party’s insolvency to the extent the non-defaulting party itself does not owe payment under an underlying master agreement to a party in the defaulting group. It is not this Court’s place, however, to second-guess the wisdom of a contractual provision whose meaning is plain. This is especially true in this case, where the parties entered into the Netting Agreement on the heels of publicity indicating that Enron might be at risk for insolvency, and thus ostensibly designed the Netting Agreement to manage their exposure to risk.
The express purpose of the Netting Agreement limits the rights and remedies of the parties in the event of a default of an underlying master agreement. The language of the contract painstakingly details the limited rights and remedies of the parties. As the Netting Agreement provides in its recitals:
Each Counterparty Party desires now to provide in this Agreement for its right to terminate, liquidate, net, setoff, and apply Collateral upon a Default by, and prior to Default determine the Collateral requirements of, any Enron Party under any one or more of the Underlying Master Agreements as herein specified, including, without limitation, by permitting each Counterparty Party to terminate, liquidate, net, setoff, and apply Collateral across all of the Underlying Master Agreements and to treat this Agreement, the Underlying Master Agreements, and all Transactions thereunder as a single agreement, whether or not the Obligations arising under the Underlying Master Agreements and Transactions thereunder are in connection with (a) cash settled Transactions or physically settled Transactions or (b) securities contracts, forward contracts, commodities contracts, repurchase agreements, swap agreements, or similar agreements.
The Netting Agreement defines “Coun-terparty” as “RES and RESC (Reliant).” This language indicates that under this Netting Agreement, Reliant’s rights are limited to termination, liquidation, netting, setoff, and the application of Collateral. The language also suggests that the obligations of the parties arise from the underlying master agreements and their referenced transactions. There is no language in the contract that entitles Reliant to choose from which Enron party they will collect a debt created by the obligations arising under an underlying master agreement. Nowhere in the language of this carefully crafted Netting Agreement is there an express or implied imposition of an obligation of Enron Canada to pay the debts of any other Enron party.
After reviewing the Netting Agreement as a whole, I find that the interpretation advanced by Reliant is not a viable alternative construction of the contract. Because I am persuaded by Enron’s interpretation of the Netting Agreement, the only possible alternative reading left, I find that the Netting Agreement unambiguously precludes a finding of joint liability by limiting the rights and remedies available to the parties to those expresssly set forth therein. Nowhere in the Netting Agreement does it state that the parties are jointly liable. The words of the Netting Agreement are clear that each group has the right to “terminate, liquidate, net, set-off, and apply Collateral across all of the Underlying Master Agreements.” Indeed, this list appears several times throughout the Netting Agreement. As evidenced by *832 the Master Power Purchase and Sale Agreement, the parties aggregated some of the rights found in the underlying master agreements, but did not alter their payment responsibilities under those underlying master agreements. The parties were careful to provide for guarantors in the underlying master agreements, as evidenced by the language of the Master Power Purchase and Sale Agreement, but chose not to use analogous language in the Netting Agreement. Rather, the parties expressly enumerated the rights and remedies available under the Netting Agreement. The contract must be read to express the parties’ intent not to impose joint liability under the Netting Agreement. I read the contract to not include the guaranteeing of the debts of co-parties.[2]
Reliant’s view of the Netting Agreement carelessly conflates different rights under the Netting Agreement in order to fashion implied joint liability. Although Section 2 allows for Reliant to declare Enron Canada in default of the settlement amount, it also lists the specific rights granted to the non-defaulting party which includes such remedies as setoff, netting, and retaining collateral, but it does not impose a duty upon the different parties to pay the debts of the other defaulting parties. Specifically, the Netting Agreement states that “Settlement Amount means the net amount that is due and payable by one Party to the other Party in respect of an Underlying Master Agreement upon the exercise of the Non-defaulting Party of the rights set forth in Section 2(b).” Section 2(b) would at most give Reliant specific rights to: (i) accelerate, terminate, or close-out all Transactions under the Master Power Purchase and Sale Agreement; (ii) exercise rights of setoff, netting or recoupment under its underlying master agreement; (iii) retain any collateral; (iv) without payment and performance on any of its debts owed to Enron Canada in order to setoff against, net, or recoup Enron’s obligations to Reliant; (v) convert any obligation from one currency into another currency; and (vi) to file a breach of contract claim against the Enron parties in order to protect, preserve, or enforce its rights as enumerated in the Netting Agreement or to reduce any risk of loss or delay. Indeed, Reliant exercised its rights under Section 2(b) by giving notice to EPMI that it has defaulted on the Master Power Purchase and Sale Agreement.
By specifically demanding payment from Enron Canada, Reliant overstepped the scope of its rights under the Netting Agreement. The record reveals that Reliant has properly terminated the underlying master agreements, assigned cross-default, setoff its debts to the Enron Parties against the debts owed to it by the Enron Parties, netted payments in order to determine the settlement amount of the underlying master agreement, has determined the final settlement amount, and has given proper notice. Because it is clear that Reliant’s rights are limited to the right to “terminate, liquidate, net, setoff, and apply Collateral upon a Default,” it has exhausted all of its rights under the Netting Agreement. According to Section 2(b) Reliant has the right to file suit to protect its limited rights. As I have demonstrated, Reliant’s rights under the Netting Agreement have not been hindered, thus theoretically its only existing recourse is to file a breach of contract claim against EPMI *833 for payment under the terms of the Master Power Purchase and Sale Agreement.[3]
Because I find that by its terms, purpose, and context, the Netting Agreement does not impose liability on Enron Canada to pay Reliant’s proposed final settlement amount, I would affirm the district court’s order dismissing Reliant’s claims. Moreover, the Panel’s remand of this case back to the district court for a hearing on the parties’ intent is not the most judicially efficient method for resolution. According to Reliant, the parties agree that the contract is unambiguous, but that its interpretation is a question of law for the Court to determine. The parties already have asserted their conflicting interpretations to the district court and to this Court: Difficult though it may be, it is up to this Court to decide the respective obligations of the parties on this record. I am unpersuaded that the parties will present any greater insight about the language in dispute during a reprise on remand than they did before. The most that the majority achieves is that it sends an intractable dispute back to the district court where the parties may decide to settle this case rather than traverse the appellate court again following another ruling by the district court. I would affirm the district court on this issue. Accordingly, I respectfully dissent.

. Under the terms of the contract, the "Final Settlement Amount” is different from the "Settlement Amount” and constitutes a different calculation as set forth in Section 4.

. Reliant's November 30, 2001 letter providing notice of default states in relevant part: Pursuant to Article 2 of the Agreement, the Reliant Parties wish to inform you that under the Master Power Purchase and Sale Agreement dated effective September 22, 2000 between RES (Reliant) and EPMI, an Event of Default(s) under Section 5.1(g) and/or Section 5.1(h)(iii) has occurred and is continuing.

. EPMI, however, is protected from a suit through the automatic bankruptcy stay.