**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 29, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 02-20447

RELIANT ENERGY SERVICES, INC.,

Plaintiff – Appellant,

versus

ENRON CANADA CORP.,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before DeMOSS and STEWART, Circuit Judges,  and FALLON[*], District Judge.

DeMoss, Circuit Judge:

Under a Master Netting, Setoff, and Security Agreement ("Netting Agreement"), Reliant Energy Services, Inc. ("RES") and Reliant Energy Services Canada, Ltd. ("RESC") (collectively, "Reliant" or "Reliant Parties") sought $78,468,996.60 from Enron Canada Corporation ("Enron Canada").  Reliant filed a breach of contract claim in federal court against Enron Canada seeking a declaratory judgment that the terms of the Netting Agreement made Enron Canada jointly liable for $78,468,996.60 and an injunction

---

[*] U.S. District Judge, Eastern District of Louisiana, sitting by designation

requiring Enron Canada to pay this amount into the registry of the court. Enron Canada moved to dismiss the claim asserting lack of personal jurisdiction and, in the alternative, that Reliant violated a 11 U.S.C. § 362(a) bankruptcy stay. The district court found that personal jurisdiction was not lacking, but agreed that the bankruptcy stay extended to the Enron Corporation also extended to its subsidiary, Enron Canada under the "unusual circumstances" exception articulated in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986). The district court also found that the terms of the Netting Agreement imposed no liability on Enron Canada for the debts of other Enron entities and denied Reliant's request for a preliminary injunction. For the following reasons, we conclude that the terms of the Netting Agreement are ambiguous, and therefore we vacate the district court's decision and remand for further consideration.

## BACKGROUND

The dispute arises from a history of trading between Reliant and five subsidiaries of the Enron Corporation. Reliant and Enron North America Corp. ("ENA"), Enron Broadband Services, L.P. ("EBA"), ENA Upstream Company, LLC ("ENAUPSCOM"), Enron Canada, and Enron Power Marketing, Inc. ("EPMI") (collectively, "Enron" or "Enron Parties") executed and performed various master sales agreements that set forth the terms and conditions under which they traded, purchased and sold natural gas, electricity, and broadband

2

data capacity ("underlying master agreements"). Each agreement was between a single Enron party and a single Reliant party and laid out the terms of their dealings in a single commodity or product.

Reliant and the various Enron subsidiaries performed under these underlying master agreements without incident for several years. In October 2001, however, news agencies began publishing reports that questioned the Enron Corporation's accounting practices and the accuracy of their financial statements. At that time, the Enron Parties approached the Reliant Parties with the proposed Netting Agreement which effectively combined all of the existing underlying master agreements into "one single integrated agreement" governing payment, settlement, collateral, security interests, defaults and other terms.[1] On November 8, 2001, the Reliant Parties and the Enron Parties executed the Netting Agreement.

The Netting Agreement provides that if one of the parties to an underlying master agreement defaulted on its obligations, the non-defaulting party could declare all of the underlying master agreements in default, otherwise referred to as cross-default. After giving all the parties notice of the default to the other parties, under section 2(b), the "Underlying Master Agreements Close-Out" provision of the Netting Agreement, the non-defaulting

---

[1] Although the Netting Agreement refers to at least six underlying master agreements, the record contains only one, the Master Power Purchase & Sale Agreement, an underlying master agreement between Reliant and EPMI.

party has the right to take the following actions:

> (i) accelerate, terminate, and liquidate, or otherwise close-out all Transactions under its Underlying Master Agreements as of such designated date; (ii) exercise rights of setoff, netting and/or recoupment in accordance with the terms of its Underlying Master Agreements; (iii) retain any Collateral; (iv) with respect to each Defaulting Party, withhold payment and performance of each Non-defaulting Party's Obligations to each Defaulting Party to pay, secure, setoff against, net, and/or recoup such Defaulting Party's Obligations to such Non-Defaulting Party; (v) convert any Obligation from one currency into another currency as set forth in Section 5; and (vi) take any other action permitted by law or in equity or by its Underlying Master Agreements or any Transactions thereunder necessary or appropriate to protect, preserve, or enforce its rights or to reduce any risk of loss or delay.

The exercise of the Section 2(b) right to close-out the transactions under the underlying master agreements results in a "Settlement Amount" for each underlying master agreement. The term "Settlement Amount" is defined as "the net amount that is due and payable by one Party to the other Party in respect of an Underlying Master Agreement upon the exercise by the Non-defaulting Party of the rights set forth in Section 2(b)." (emphasis added). The Netting Agreement provides that "'Party' means ENA, EPMI, EBS, ENAUPSCOM, ECC (Enron Canada), RES, and RESC as the context indicates, and 'Parties' means all of the foregoing." Section 4 of the Netting Agreement provides for a netting or offsetting of the settlement amounts derived from each underlying master agreement to arrive at a final settlement amount that is payable by the group from whom such payment is due. Moreover, it sets forth the

4

procedure by which the final settlement amount is to be remitted.[2]

On November 30, 2001, Reliant issued notice to the Enron parties, pursuant to Section 2 of the Netting Agreement that EPMI was in default on the Master Power Purchase and Sale Agreement, an underlying master agreement; and therefore, that all of the Enron Parties were in default under the Netting Agreement. On December 2, 2001, the Enron Parties, except for Enron Canada, filed for Chapter 11 bankruptcy protection. Thereafter, these Enron Parties were protected from suit through the automatic stay provision of 11 U.S.C. § 362(a). After netting the settlement amount as required by Section 4, Reliant determined that the final settlement amount

---

[2] Section 4 provides in relevant part as follows:
> Upon Non-defaulting Group's exercise of the Underlying Master Agreements Close-Out, the Settlement Amounts under the Underlying Master Agreements shall be netted and reduced by the exercise of rights to apply Collateral pursuant to all rights granted in this Agreement (as so netted and reduced, the "Final Settlement Amount"). Upon determination of the Final Settlement Amount, Non-defaulting Group shall provide Defaulting Group with a statement showing the calculation of the Final Settlement Amount. The Final Settlement Amount shall be payable by the Group from whom such payment is due on the third Business Day after the statement is provided. In the event of a dispute as to the Final Settlement Amount payable by a Group, such Group shall, within the time prescribed herein, pay the undisputed amount of the Final Settlement Amount without delay. If the Parties are unable to resolve the disputed amount of the Final Settlement Amount within 10 days, the matter shall be submitted to arbitration in accordance with Section 16. (underlining added)

payable by the Enron Group to be $78,468,996.60.[3]  On February 19, 2002, Reliant sent notice to EPMI through ENA stating that a "final settlement amount" was due, but that no funds were forthcoming. The very next day, Reliant sent a letter stating that "[n]othing contained in the [February 19 letter] was intended to be, nor should be construed to have been a violation of 11 U.S.C. § 362(a)," the automatic stay provision of Chapter 11 bankruptcy protection.

On February 26, 2002, Reliant filed suit against Enron Canada, the only Enron party which had not filed for bankruptcy protection.[4]  Reliant claimed that Enron Canada breached the Netting Agreement, seeking inter alia, injunctive relief and a declaration that Enron Canada was jointly liable for the $78,468,996.60 under the Netting Agreement.  Enron Canada filed a motion to dismiss, arguing, among other things, that it was not subject to the court's jurisdiction, that Reliant's suit was subject to the automatic stay in bankruptcy, and that Enron Canada was not liable for the debts of its affiliates under the Netting Agreement.  The district court dismissed Reliant's suit, finding

---

[3] Reliant reached this $78,486,996.60 amount by subtracting the amounts that Reliant owed different Enron Parties from the total deficit. Prior to netting, Reliant Canada owed Enron Canada in excess of $4,000,000.

[4] Reliant filed suit only as the domestic entity of Reliant Energy Services, Inc., thus avoiding any potential subject matter jurisdiction problems due to lack of diversity. Federal jurisdiction, however, arises from 28 U.S.C. § 2201.

that it was subject to the automatic stay and that Enron Canada did not owe $78,468,996.60 to Reliant under the Netting Agreement.

## DISCUSSION

### Does the Netting Agreement impose joint liability upon the Enron parties?

The district court determined that generally the Netting Agreement does not impose an affirmative obligation on one party to cover all the debts of another. Thus, as part of its analysis of whether to extend the bankruptcy stay to Enron Canada, the district court determined that the Netting Agreement limits the forms of recovery to which Reliant is entitled. In particular, the district court determined that the language of the Netting Agreement unambiguously includes the right to terminate, liquidate, net, setoff, and apply collateral; and does not include the right to impose joint liability on Enron Canada.

We review the district court's interpretation of the Master Netting Agreement *de novo*. A determination of whether a contract is ambiguous and the interpretation of a contract are questions of law, which on appeal are reviewed de novo. *Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). As this litigation involves the free trade of commodities with Canada, a free trade area country, federal jurisdiction is based on 28 U.S.C. § 2201; and therefore, federal law governs the interpretation of the Netting Agreement. *See United States v. Taylor*, 333 F.2d 633, 638 (5th Cir. 1964) ("[I]t is clear that federal law will control

7

contracts between private parties if there is sufficient federal interest.").[5]  A contract is ambiguous only if its meaning is susceptible to multiple interpretations.  The mere fact that the parties may disagree on the meaning of a contractual provision is not enough to constitute ambiguity.  When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written.  *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.*, 112 F.3d 184, 186 (5th Cir. 1997).  "When interpreting a contract, the question is what was the parties' intent, [because] courts are compelled to give effect to the parties' intentions." *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981).  To determine intent, we look to the plain language of the contract, its commercial context, and its purposes.  *Id.; see also*, *Transnat'l Learning Cmty at Galveston, Inc. v. United States Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000) ("[A] contract should be interpreted as to give meaning to all of its terms--presuming that every provision was intended to accomplish some purpose and that none are deemed superfluous.").

Both Reliant and Enron Canada argue that the Netting Agreement is unambiguous in their respective favors.  Reliant asserts that use of the term "Group" in Section 4 of the Netting Agreement -

---

[5] Although under Section 9 of the Netting Agreement, the parties agreed that the contract shall be governed by and construed in accordance with the laws of the State of New York, there is sufficient federal interest such that federal law governs the interpretation of this contract.

"the Final Settlement Amount shall be payable by the Group from whom such payment is due" – imposes liability on Enron Canada because it is part of the Enron Group. Reliant also makes several arguments that the Netting Agreement imposes joint liability on Enron Canada. Enron Canada asserts that Section 4 embodies only two functions, neither of which imply joint liability. First, it obligates payment from the original group from whom the money was due consistent with the applicable underlying master agreement. Second, it creates a mechanism for calculating the final settlement amount against that particular party after setoff. The primary difference between the two interpretations is that Enron Canada contends that the Netting Agreement only entitles Reliant to set off the amount they owe to Enron against the amount owed to them in order to calculate the final settlement amount; while, Reliant believes that they are entitled to not only set off the amounts, but also to choose from whom they wish to collect. Though both parties argue that the contract unambiguously compels a finding in their favor, we disagree and find that the contract is ambiguous as to whether it imposes joint liability on the various Enron Parties.

If a contract imposes joint liability on several parties then all joint obligors are bound for the whole performance of the contract. This is the consistent view of the various treatises on contract law and the Restatement (Second) of Contracts which is the

9

law of this Circuit as well.[6]  *See* Restatement (Second) of Contracts 2d §§ 288-89; *see also* **DeLeon v. Lloyd's London, Certain Underwriter's**, 259 F.3d 344 (5th Cir. 2001) (citing **Pitman**).  As a general rule, an obligation entered into by more than one person is presumed to be joint.  Williston on Contracts, § 36:3 at 621 (4th ed. 1999).

> This presumption will not be overcome unless there are either (1) express words to render the obligation several or joint and several (often referred to as "words of severance"); (2) the terms of the promise considered in the light of the surrounding circumstances indicate an intention to be bound severally, or jointly and severally; or (3) there is a statute that declares that every contract, though joint in its terms, is to be considered several as well as joint.

*Id.* at 621-23.  The Restatement (Second) of Contracts 2d § 288 similarly provides:

> Promises of the Same Performance
> (1) Where two or more parties to a contract make a promise or promises to the same promisee, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.

---

[6] This also appears to be the law in Texas, the location of the district court where the case was heard, and the law in New York, which is the state whose laws were contractually agreed upon to apply to the contract. *See* **Pitman v. Lightfoot**, 937 S.W.2d 496, 528 (Tex. Civ. App. - San Antonio 1996 writ denied); **In re Moss**, 249 B.R. 411, 420 (Bankr. N.D. Tex. 2000); **Mfgs. & Traders Trust Co. v. Lindauer**, 513 N.Y.S.2d 629, 634 (N.Y. Sup. Ct. 1987) (quoting Williston on Contracts); *see also* **Holland v. Fahnestock & Co., Inc.**, 210 F.R.D. 487, 502 (S.D.N.Y. 2002) (stating that "[i]nherent in the concept of joint and several liability is the right of a plaintiff to satisfy its whole judgment by execution against any one of the multiple defendants who are liable to him.").

(2) Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given.

Restatement (Second) of Contracts 2d § 288 (1981). Also under § 289, if promisors have entered a contract jointly then they are each bound for the whole performance. However, determining what parties are obligated under a multi-party, multi-promise agreement is much more complicated. Indeed, as Corbin on Contracts instructs, "[i]t must be borne in mind that two or more persons may, by a single instrument containing only one promissory expression, bind themselves to pay wholly separate sums of money or to render any other entirely distinct performances." 9 Corbin on Contracts § 937 at 685 (interim ed. 2002). Corbin goes on to explain that parties may subscribe separate amounts but that this may come down to merely how a contract is interpreted. *Id.* at 685-86.

As no statute exists to displace the joint obligations, this Court must determine whether the Netting Agreement imposes several or joint obligations upon the Enron parties looking to the contract for (1) express words which might render the obligations several or joint and several, or (2) whether the terms of the promise considered in the light of the surrounding circumstances indicate an intention to be bound severally, or jointly and severally. The sentence of Section 4 which is underlined in footnote 2 supra is of critical importance in this regard. This sentence is an express

11

covenant for payment of the amount of the Final Settlement Amount at a date certain by "the <u>Group</u> from whom such payment is due." This covenant of payment is separate and distinct from all of the other covenants between the parties; and is in our view the ultimate purpose of the Netting Agreement.  The Netting Agreement states that the term "'Group' means Enron Group or Counterparty Group, as applicable."  The Netting Agreement defines "Enron Group" to mean "all Enron Parties."  Moreover, the Netting Agreement defines "Enron Party" as meaning "any of ENA, EPMI, EBS, ENAUPSCOM, and ECC (Enron Canada)."

If the term "all Enron Parties" is inserted in place of the word "Group" in the critical sentence of Section 4 of the contract, it would read: "The Final Settlement Amount shall be payable by <u>all Enron Parties</u> from whom such payment is due on the third business day after such statement."  The words "from whom such payment is due" would modify "all Enron Parties" which would seem to indicate that the particular party that owes money is obligated to pay. Under this reading, the plain language of the Netting Agreement would impose no liability on Enron Canada to pay the final settlement owed to Reliant as a result of EPMI's default under the Master Power Purchase and Sale Agreement.  Such a reading could indicate that the language of Section 4 is intended to sever the obligation of each party to pay debts accrued under all of the underlying master agreements. *See **Alexander v. Wheeler***, 407

12

N.Y.S.2d 319, 320 (N.Y. App. Div. 1978) (explaining that under New York law, words of severance are necessary to overcome a presumption of joint obligations). The difficulty with this reading, however, is that it renders the determination of the Final Settlement Amount meaningless, for that amount is itself clearly a sum resulting from off-setting all of the various amounts owed between the Enron Parties and Counterparties (Reliant) on the underlying master sales agreements. In other words, it makes little sense for the parties to calculate a Final Settlement Amount if that amount cannot be collected from any entity. Furthermore, this reading would negate the purpose of the cross-default right, found in Section 2(b), and the cross-collateral rights, found in Section 6 and Annex A, which the Netting Agreement clearly contemplates for the benefit of the Non-Defaulting Party.

However, the terms of Section 4 may also be reasonably read another way. The phrase "from whom such payment is due" could be read as modifying the word "Group" and the word "Group" means "Enron Group or Counter Party Group, as applicable." The phrase "from whom such payment is due," therefore, permits us to determine which of the two meanings of the word "Group" is "applicable." There is no dispute that the "Final Settlement Amount" was properly determined in accordance with the language of the Netting Agreement and the net balance owed was from the Enron Group to the Counter Party Group, (Reliant). Consequently, once used for this purpose the phrase "from whom such payment is due" would be surplusage and

13

the relevant sentence could be interpreted as reading: "the Final Settlement Amount shall be payable by all Enron Parties on the third business day after the statement is provided." Under this interpretation of the contract language, "all Enron Parties" would be jointly liable to pay the final settlement amount. This raises the question, however, that if this was the intended meaning, why did the parties not repeat using the term "Defaulting Group" instead of "Group" in Section 4 and omit the phrase "from whom such payment is due" all together. A possible explanation is that until the Final Settlement Amount is actually determined as of the point in time when the right to close out all of the underlying agreements has been exercised, there is no way to predict whether the Defaulting Party will owe money to the Non-Defaulting Party, or vice versa. Therefore, the parties used the phrase "by the Group from whom such payment is due" to cover either eventuality. Adding additional confusion to this issue is the fact that the Netting Agreement makes no mention anywhere else amongst its provisions that the obligations are being entered into jointly as to payment of the Final Settlement Amount.

Viewing the Master Netting Agreement as a whole adds no further illumination on the subject. The Netting Agreement purports to incorporate all of the underlying agreements between the various parties, but the only underlying agreement in the record on appeal is the Master Power Purchase & Sale Agreement between Reliant and EPMI; and that underlying agreement, creates no

14

rights to collect amounts owed from anyone but the parties involved in that particular contract. Though the parties agree that the Netting Agreement creates the right to set-off amounts owed between the different Enron and Reliant parties, this does not necessarily mean that the Final Settlement Amount can be collected from any party unless that party is otherwise jointly and severally liable. In short, nothing in the Netting Agreement expressly states the parties' intentions as to whether the Final Settlement Amount is or is not a joint obligation of the members of the "group from whom such payment is due." As such, we find that the Netting Agreement is ambiguous as to this point and particularly with respect to Section 4 and the meaning of the term "Group." The district court did not make a finding as to the intentions of the parties as it apparently felt the contract was unambiguous in favor of Enron Canada and granted summary judgment in Enron's favor. We disagree and find that the Netting Agreement is ambiguous and therefore remand this case to the district court to make a factual determination as to the intentions of the parties and, in particular, to determine the parties' intended meaning of the term "Group" in Section 4.

**Does the bankruptcy stay extend to Enron Canada?**

The district court also granted Enron Canada's motion to dismiss based on the bankruptcy stay in place for the other Enron entities. The district court based this decision, in part on *A.H.*

*Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), and found that the present case constituted the type of unusual circumstances that should extend a bankruptcy stay. Reliant claims that this case was an inappropriate extension of the bankruptcy stay provisions and that the Fifth Circuit has never adopted the reasoning of *A.H. Robins Co.*

This Court reviews the scope of an automatic stay *de novo*. *Kosadnar v.Metropolitan Life Ins. Co.*, 157 F.3d 1011, 1013 (5th Cir. 1998). The purposes of the bankruptcy stay under 11 U.S.C. § 362 "are to protect the debtor's assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse." *Gatx Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985). "By its terms the automatic stay applies only to the debtor, not to co-debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code nor to co-tortfeasors." *Id.* This Court has also noted that "[s]ection 362 is rarely, however, a valid basis on which to stay actions against non-debtors." *Arnold v. Garlock, Inc.* 278 F.3d 426, 436 (5th Cir. 2001). However, an exception to this general rule does exist, and a bankruptcy court may invoke § 362 to stay proceedings against nonbankrupt co-defendants where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or

16

finding against the debtor." *A.H. Robins Co.*, 788 F.2d at 999. This Court recognized the *A.H. Robins Co.*'s exception in *Arnold*, but declined to extend it in that case because no claim of a formal tie or contractual indemnification had been made to create an identity of interests between the debtor and nondebtor. 278 F.3d at 436. Also, in *Edwards v. Armstrong World Industries*, this Court refused to extend the *A.H. Robins* exception to a surety, holding that a supersedeas bond may be executed against the surety of a judgment debtor. 6 F.3d 312, 316-17 (5th Cir. 1993), *reversed on other grounds*, 514 U.S. 300 (1995).

Though the district court found that the exception should extend to Enron Canada in this case, its order was premised largely on its finding that Enron Canada was not obligated under the contract to pay for the debts of the other Enron parties. The district court's conclusion that the Netting Agreement does not impose joint liability upon the different Enron Parties was actually a part of its analysis as to whether or not the bankruptcy stay should extend to Enron Canada. As the district court premised its decision on its interpretation of the Netting Agreement, and as we have held that the Netting Agreement is ambiguous, we vacate the district court's decision to extend the bankruptcy stay, and remand to the district court to reconsider this issue in light of its findings as to the meaning of the Netting Agreement. Should the district court find that the Netting Agreement imposes no

obligation upon Enron Canada to cover the debts of the other Enron parties, then the bankruptcy stay issue will become moot. If, however, the district court finds that a joint obligation is imposed by the Netting Agreement, then it will have to re-visit this issue in light of that new finding.

## CONCLUSION

As we find that the Netting Agreement between Reliant and Enron is ambiguous as to its language regarding whether the Enron parties are jointly liable, we REVERSE the district court's grant of summary judgment and REMAND the case to the district court. On remand, the district court is to determine the intentions of the parties' as to liability under the contract, and, in particular, to determine the parties' intended meaning of the term "Group" in Section 4. As the district court's denial of Reliant's request for a preliminary injunction appears to have been based on its dismissal of the case on its merits, we REVERSE the district court's decision on this issue as well so that, on remand, the district court may determine whether Reliant has established the necessary elements to entitle it to a preliminary injunction.[7] As

---

[7] "A preliminary injunction is an extraordinary equitable remedy that may be granted only if the plaintiff establishes four elements: 1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." **Hoover v. Morales**, 164 F.3d 221, 224 (5th Cir. 1998).

18

the district court relied upon its conclusion that the Netting Agreement imposes no joint obligations upon the various Enron parties in its decision to extend the bankruptcy stay, and as we have remanded the case on that issue, we also VACATE the district court's decision in this regard and REMAND for further proceedings consistent with this opinion. We do not comment, therefore, on whether the 11 U.S.C. § 362(a) bankruptcy stay extends to Enron Canada.

**VACATED, in part, and REVERSED and REMANDED.**

CARL E. STEWART, Circuit Judge, dissenting:

I respectfully dissent from the panel majority's conclusion that the Master Netting, Setoff, and Security Agreement ("Netting Agreement") is ambiguous regarding joint liability for the following reasons. I agree with the majority's statement of the facts and procedural history, so I will not recite them here.

The majority concludes that a contract that is absolutely devoid of any reference to "joint liability" and that painstakingly circumscribes the respective rights and obligations of the parties inter se upon an event of default on an underlying agreement, is ambiguous regarding whether it imposes an affirmative obligation on one party to cover all the debts of another. The majority further concludes that this ambiguity requires remanding this case to the district court, ostensibly for the purpose of adducing evidence of the parties' intentions regarding their respective obligations. I disagree with both conclusions.

The thrust of the majority's opinion is that the Netting Agreement is ambiguous because it is susceptible to two possible interpretations: one which the majority concedes gives effect to the plain meaning of the contractual language, and a second interpretation which, by the majority's own admission, renders other provisions of the contract surplusage and is at best unsupported by any other contractual term.

As the majority acknowledges, a contract is not ambiguous merely because it is susceptible to two or more interpretations. Moreover, it is axiomatic that a contract is susceptible to two or more interpretations only if more than one of the alternative readings advanced is viable. To "determin[e] the presence of ambiguity vel non," this Court must both examine the provision in question and construe that provision in the context of the agreement as a whole. Central States,

<u>Southeast and Southwest Areas Pension Fund v. Creative Dev. Co.</u>, 232 F.3d 406, 414 (5th Cir. 2000).  The particular provision targeted by the majority as the source of ambiguity in the parties' Netting Agreement appears in section 4, which states in pertinent part:

> Upon Non-defaulting Group's exercise of the Underlying Master Agreements Close-Out, the Settlement Amounts under the Underlying Master Agreements shall be netted and reduced by the exercise of rights to apply Collateral pursuant to all rights granted in this Agreement (as so netted and reduced, the "Final Settlement Amount"). Upon determination of the Final Settlement Amount, Non-defaulting Group shall provide Defaulting Group with a statement showing the calculation of the Final Settlement Amount. The Final Settlement Amount shall be payable by the Group <u>from whom such payment is due</u> on the third Business Day after the statement is provided.

It is undisputed that the functional purpose of this provision is to set forth the rights and duties of the parties following the exercise of the Close-Out remedies afforded by Sections 2(b) and 3 in the event of a default on an underlying master agreement.  What is in dispute is the scope of the remedies contemplated by Section 4, specifically, whether that provision imposes joint liability on the parties to the Netting Agreement.  Reliant argues that because all of the Enron parties are subject to the Netting Agreement, each individual party is jointly obligated under the contract.  Enron Canada counters that the Netting Agreement functions to aggregate a series of underlying master agreements between and among various parties into one agreement for the limited purpose of triangular setting off and netting payments consistent with the underlying agreements.  The majority, finding both of the conflicting interpretations staked out by the parties in favor of their respective positions problematic, concluded that section 4 of the Netting Agreement is ambiguous.  I disagree, for the following reasons.

21

In determining whether a contractual provision "could have more than one sensible meaning and thus be ambiguous," this Court has found it helpful to engage in the "venerable deductive exercise known as the process of elimination." Creative Dev. Co., 232 F.3d at 414. Applied here, this Court must "first identify all of the possible" procedural and remedial functions of the provision at issue that the "words themselves could conceivably refer to in the context of the entire . . . [a]greement." Id. "We then examine each such possibility to see if it withstands legal analysis and remains a sensible reading of the agreement. If two or more of the possibilities remain viable, there is ambiguity; but if only one is left standing, there is no ambiguity." Id.

The parties and the majority have identified two possible interpretations of the impact of section 4's phrase "Group from whom payment is due" on the scope of the parties' rights and obligations: 1) Reliant's position, that section 4 imposes joint liability on Enron Canada for debts of all of its affiliates; and 2) Enron Canada's position, that section 4 merely obligates payment from the original group from whom money was due consistent with the applicable underlying master agreement and creates a mechanism for calculating the final settlement amount against that particular party after set-off.

The majority finds Reliant's assertion that joint liability is evinced by the use of the word "Group" in Section 4 sufficiently compelling to conclude that the parties' agreement is ambiguous. Under the majority's proposed construction, the phrase "from whom such payment is due" modifies "Group," and merely permits a determination of which of the two meanings of "Group" (Enron Group or "Counter Party Group") "is applicable," with the result being that "'all Enron Parties' would become jointly liable to pay the final settlement amount." I disagree because, as the majority acknowledges, this reading renders the phrase "from whom such payment is due" surplusage once

22

the "Group" is identified in context. "When interpreting a contract, however, this Court is obligated to give meaning to all of its terms–presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." Transitional Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt., 220 F.3d 427, 431 (5th Cir. 2000); Transco Exploration Co. v. Pacific Employers Ins., Co., 869 F.2d 862, 864 n.2 (5th Cir. 1989)(instructing that in contract interpretation we must, "where possible, construe the words so as to harmonize all while rendering none superfluous"). In the instant case, the contract provides that New York law governs, but the analysis is the same. "Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." Galli v. Metz, 793 F.2d 145, 149 (2d Cir. 1992)(quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988)). "Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." Id. (internal quotations and citations omitted). Thus, we cannot leave out terms of a contract or render them surplusage and then declare that there is an ambiguity, itself a result of refusing to give effect to the contract's express provisions. The effect of the approach taken by the majority is to create a gap where there was none, necessitating resort to putative suppletive rules of joint liability that otherwise appear to be precluded by the contract's terms, purpose, and commercial context.

Indeed, the majority acknowledges the incongruity of Reliant's construction with the contract as a whole: "The netting agreement purports to incorporate all of the underlying agreements between the various parties, but the only underlying [master] agreement in the record," the contract between Reliant and EPMI, "creates no rights to collect amounts owed from anyone but the parties involved in that particular contract." The majority further concedes that the Netting Agreement's conferral

23

of the right to offset "amounts owed between two different Enron and Reliant parties does not necessarily mean that a party can collect the Final Settlement amount from all of its counter parties jointly and severally." From this, the majority concludes the contract is ambiguous.

However, I find that the interpretation offered by Reliant is neither persuasive nor is it even plausible alternative interpretation. Contrary to the majority's view, I find that the only viable interpretation, and the one that gives effect to the entirety of the parties' agreement, is that espoused by Enron Canada, and thus no ambiguity exists. Indeed, the majority concedes that "the plain language of the netting agreement would impose no liability on Enron Canada to pay the final settlement owed to Reliant as a result of EPMI's default under the Master Power Purchase and Sale Agreement." As observed by the majority, the definitional language of the Netting Agreement compels this interpretation; by inserting "all Enron Parties" in place of "Group," the disputed sentence in Section 4 would indicate that the particular party that owes money is obligated to pay, rather than the aggregate of all parties affiliated with the original defaulting party.

Nonetheless, the majority endeavors to go beyond the plain meaning of the agreement's terms to insert ambiguity where I see none. At the core of the majority's analysis is its view, shared by Reliant, that giving effect to the "plain meaning" of the contract would "render[] the determination of the Final Settlement Amount meaningless," and "negate the purpose of the cross-default right . . . in section 2(b) and the cross-collateral rights found in section 6 and annex A." In other words, the majority concludes that Enron Canada's interpretation of the Netting Agreement renders the other provisions superfluous. In so doing, the majority misapprehends the functions of these provisions. I will address each of these in turn.

First, in concluding that an interpretation of section 4 in accordance with its "plain meaning"

24

renders "the determination of a Final Settlement Amount meaningless," the majority mistakenly finds that this reading of Section 4 imposes no further duty upon the individual parties other than that in the set-off provision in Section 3 of the Netting Agreement. I disagree because these two sections unambiguously impose different duties on the parties. Section 3 contains the terms and conditions by which the non-defaulting group may setoff amounts owed among the different parties under the various underlying master agreements in order to reach a final settlement amount. Section 4 sets out the terms by which payment will be made once the final settlement amount is reached and also provides for arbitration if there is a dispute over the amount. Although Section 3 expressly grants Reliant the right to offset "any and all sums, amounts, or Obligations Owed by Defaulting Party to any Non-Defaulting Party" without further notice, Section 4 does not merely echo the same. Whereas Section 3 entitles Reliant to setoff without further notice, Section 4 provides a method for calculating the final settlement amount[8] and a process for notifying the defaulting parties of that amount. The parties' intent could not be more plain. Indeed, Reliant exercised its rights under Sections 2 and 3 and its rights to determine the final settlement amount and to notify Enron of that amount consistent with Section 4.

Second, the majority mistakenly concludes that Enron Canada's plain meaning interpretation of Section 4 negates the purpose of the cross-default rights in Section 2. The majority's reasoning is flawed because it assumes that assigning a cross-default right is tantamount to joint and several liability. In other words, the majority's view appears to be that because section 2 allows for assigning cross-default (enabling, for example, Reliant to declare Enron Canada in default of EPMI's debts),

---

[8]Under the terms of the contract, the "Final Settlement Amount" is different from the "Settlement Amount" and constitutes a different calculation as set forth in Section 4.

25

then Enron Canada must have an affirmative obligation to pay the other party's debts. I disagree.

Under Section 2(b), upon the occurrence of a default of any of the underlying master agreements, the non-defaulting group may declare the defaulting group in default of all underlying master agreements. Section 2 also provides the non-defaulting party the right to setoff its debts. Thus, by imposing cross-default on the Enron Group as a result of the default of an underlying master agreement, Reliant can exercise its right to setoff. As the Supreme Court has explained, the right of setoff itself is a valuable right. See Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995) ("The right of setoff ... allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.") (internal quotation marks and citation omitted).

Neither this right to set-off nor the right to assign cross-default entitle Reliant to the right to collect payment from an Enron party of its choosing. The purpose for allowing cross-default is clear. The Netting Agreement was written to ensure that Reliant and Enron had the right to offset, close out, and liquidate all of the underlying master agreements. In order to facilitate those rights, the Netting Agreement provided for cross-default. There is no indication in the language of the contract that the purpose of allowing cross-default is to impose joint liability or to entitle Reliant to choose from which Enron Party to collect the final settlement amount. Rather, the Netting Agreement's cross-default simply allows a non-defaulting party to net-out obligations upon the default of a counterparty, and, if insolvency is on the horizon for a defaulting party, the Netting Agreement permits the non-defaulting party to "close-out" (i.e. terminate) the transaction to prevent the non-defaulting party's losses from escalating. See Mark R. Smith, Basic Derivatives for the Oil and Gas Company, 39 Alberta L. Rev. 152, 171-72 (2001). By operation of the netting agreement's cross-

26

default provision, a non-defaulting party may choose to close-out all transactions under its underlying master agreements "across the board," even if the triggering event of default involved only one such agreement. Coupled with the net-off, set-off, recoupment, and cross-collateral rights that vest in a non-defaulting party upon the happening of a counterparty's default, the extension of default status to the affiliates of the offending counterparty significantly mitigates the non-defaulting party's losses.

Third, the majority mistakenly concludes that to find that Section 4 does not impose joint liability would negate the purpose of the cross-collateral rights contained in Section 6 and the Annex of the Netting Agreement. Like Section 2, however, the cross-collateral rights set forth in the Netting Agreement mitigate the non-defaulting party's losses upon the default of another by securing the "aggregate" obligations of the defaulting party and its affiliates ("Counter Party Group"). Thus, in the event of a default, the non-defaulting party may apply the collateral from the counterparty of its choosing to satisfy the obligation owed under the applicable underlying master agreement. Interpreting the Netting Agreement to create several obligations is in no way inconsistent with this provision. Rather, the provision expressly limits the remedy available to the non-defaulting party (and thus the exposure of all parties in the defaulting group) to the exhaustion of the amount of collateral pledged.

In essence, the majority finds that a provision that in advance sets forth the amount and source of recovery available to a party upon the default of another is "meaningless" if, when its plain meaning is given effect, the non-defaulting party's recovery is limited in source and amount such that it bears the risk of a defaulting party's insolvency to the extent the non-defaulting party itself does not owe payment under an underlying master agreement to a party in the defaulting group. It is not this Court's place, however, to second-guess the wisdom of a contractual provision whose meaning is

27

plain. This is especially true in this case, where the parties entered into the Netting Agreement on the heels of publicity indicating that Enron might be at risk for insolvency, and thus ostensibly designed the Netting Agreement to manage their exposure to risk.

The express purpose of the Netting Agreement limits the rights and remedies of the parties in the event of a default of an underlying master agreement. The language of the contract painstakingly details the limited rights and remedies of the parties. As the Netting Agreement provides in its recitals:

> Each Counterparty Party desires now to provide in this Agreement for its right to terminate, liquidate, net, setoff, and apply Collateral upon a Default by, and prior to Default determine the Collateral requirements of, any Enron Party under any one or more of the Underlying Master Agreements as herein specified, including, without limitation, by permitting each Counterparty Party to terminate, liquidate, net, setoff, and apply Collateral across all of the Underlying Master Agreements and to treat this Agreement, the Underlying Master Agreements, and all Transactions thereunder as a single agreement, whether or not the Obligations arising under the Underlying Master Agreements and Transactions thereunder are in connection with (a) cash settled Transactions or physically settled Transactions or (b) securities contracts, forward contracts, commodities contracts, repurchase agreements, swap agreements, or similar agreements.

The Netting Agreement defines "Counterparty" as "RES and RESC (Reliant)." This language indicates that under this Netting Agreement, Reliant's rights are limited to termination, liquidation, netting, setoff, and the application of Collateral. The language also suggests that the obligations of the parties arise from the underlying master agreements and their referenced transactions. There is no language in the contract that entitles Reliant to choose from which Enron party they will collect a debt created by the obligations arising under an underlying master agreement. Nowhere in the language of this carefully crafted Netting Agreement is there an express or implied imposition of an obligation of Enron Canada to pay the debts of any other Enron party.

After reviewing the Netting Agreement as a whole, I find that the interpretation advanced by Reliant is not a viable alternative construction of the contract. Because I am persuaded by Enron's interpretation of the Netting Agreement, the only possible alternative reading left, I find that the Netting Agreement unambiguously precludes a finding of joint liability by limiting the rights and remedies available to the parties to those expresssly set forth therein. Nowhere in the Netting Agreement does it state that the parties are jointly liable. The words of the Netting Agreement are clear that each group has the right to "terminate, liquidate, net, setoff, and apply Collateral across all of the Underlying Master Agreements." Indeed, this list appears several times throughout the Netting Agreement. As evidenced by the Master Power Purchase and Sale Agreement, the parties aggregated some of the rights found in the underlying master agreements, but did not alter their payment responsibilities under those underlying master agreements. The parties were careful to provide for guarantors in the underlying master agreements, as evidenced by the language of the Master Power Purchase and Sale Agreement, but chose not to use analogous language in the Netting Agreement. Rather, the parties expressly enumerated the rights and remedies available under the Netting Agreement. The contract must be read to express the parties' intent not to impose joint liability under the Netting Agreement. I read the contract to not include the guaranteeing of the debts of co-parties.[9]

---

[9]Reliant's November 30, 2001 letter providing notice of default states in relevant part:

> Pursuant to Article 2 of the Agreement, the Reliant Parties wish to inform you that under the Master Power Purchase and Sale Agreement dated effective September 22, 2000 between RES (Reliant) and EPMI, an Event of Default(s) under Section 5.1(g) and/or Section 5.1(h)(iii) has occurred and is continuing.

Reliant's view of the Netting Agreement carelessly conflates different rights under the Netting Agreement in order to fashion implied joint liability. Although Section 2 allows for Reliant to declare Enron Canada in default of the settlement amount, it also lists the specific rights granted to the non-defaulting party which includes such remedies as setoff, netting, and retaining collateral, but it does not impose a duty upon the different parties to pay the debts of the other defaulting parties. Specifically, the Netting Agreement states that "Settlement Amount means the net amount that is due and payable by one Party to the other Party in respect of an Underlying Master Agreement upon the exercise of the Non-defaulting Party of the rights set forth in Section 2(b)." Section 2(b) would at most give Reliant specific rights to: (i) accelerate, terminate, or close-out all Transactions under the Master Power Purchase and Sale Agreement; (ii) exercise rights of setoff, netting or recoupment under its underlying master agreement; (iii) retain any collateral; (iv) without payment and performance on any of its debts owed to Enron Canada in order to setoff against, net, or recoup Enron's obligations to Reliant; (v) convert any obligation from one currency into another currency; and (iv) to file a breach of contract claim against the Enron parties in order to protect, preserve, or enforce its rights as enumerated in the Netting Agreement or to reduce any risk of loss or delay. Indeed, Reliant exercised its rights under Section 2(b) by giving notice to EPMI that it has defaulted on the Master Power Purchase and Sale Agreement.

By specifically demanding payment from Enron Canada, Reliant overstepped the scope of its rights under the Netting Agreement. The record reveals that Reliant has properly terminated the underlying master agreements, assigned cross-default, setoff its debts to the Enron Parties against the debts owed to it by the Enron Parties, netted payments in order to determine the settlement amount of the underlying master agreement, has determined the final settlement amount, and has given proper

30

notice. Because it is clear that Reliant's rights are limited to the right to "terminate, liquidate, net, setoff, and apply Collateral upon a Default," it has exhausted all of its rights under the Netting Agreement. According to Section 2(b) Reliant has the right to file suit to protect its limited rights. As I have demonstrated, Reliant's rights under the Netting Agreement have not been hindered, thus theoretically its only existing recourse is to file a breach of contract claim against EPMI for payment under the terms of the Master Power Purchase and Sale Agreement.[10]

Because I find that by its terms, purpose, and context, the Netting Agreement does not impose liability on Enron Canada to pay Reliant's proposed final settlement amount, I would affirm the district court's order dismissing Reliant's claims. Moreover, the Panel's remand of this case back to the district court for a hearing on the parties' intent is not the most judicially efficient method for resolution. According to Reliant, the parties agree that the contract is unambiguous, but that its interpretation is a question of law for the Court to determine. The parties already have asserted their conflicting interpretations to the district court and to this Court: Difficult though it may be, it is up to this Court to decide the respective obligations of the parties on this record. I am unpersuaded that the parties will present any greater insight about the language in dispute during a reprise on remand than they did before. The most that the majority achieves is that it sends an intractable dispute back to the district court where the parties may decide to settle this case rather than traverse the appellate court again following another ruling by the district court. I would affirm the district court on this issue. Accordingly, I respectfully dissent.

---

[10]EPMI, however, is protected from a suit through the automatic bankruptcy stay.